# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                Plaintiff,

     v.                                      Case No. 08-CV-173

C.G. SCHMIDT, INC.,

                Defendant.

_____

# ORDER

A person who formally accuses their employer of engaging in legally insidious discrimination is afforded protection by the law in that the employer cannot, because of the complaint, take adverse action against the employee. If the employer does take such action, the employee has a separate legally cognizable claim against his or her employer. However, the viability of such a legal recourse is contingent on the employee's ability to demonstrate that the employer's action was actually retaliatory in nature and not taken for an entirely different reason. The question in this case is whether the plaintiff, bringing a suit on behalf of a former employee, has provided enough evidence at the summary judgment stage to indicate that retaliation occurred. Upon examination of the voluminous record both parties presented to the court, the court concludes that the plaintiff has met its burden and this case is appropriate for trial.

## FACTUAL BACKGROUND

The Equal Employment Opportunity Commission ("EEOC" or "Commission") brought a complaint against C.G. Schmidt, Inc. ("CGS") on February 26, 2008,

contending that the defendant engaged in unlawful employment practices in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), specifically alleging that CGS terminated Frederick Jackson ("Jackson") in response to Jackson's filing of an earlier complaint for racial discrimination against the company. After several months of discovery concluding in February of 2009, the defendant filed the present motion for summary judgment, arguing that no serious issue of factual dispute exists between the parties and that CGS is entitled to judgment as a matter of law. The court begins by recounting the factual background animating the current litigation. As the present motion is one for summary judgment, the court resolves all conflicts in the evidence and draws all permissible inferences in favor of the non-moving party. *Berger v. AXA Network LLC,* 459 F.3d 804, 806 (7th Cir. 2006).

CGS is the "largest Milwaukee-area contractor" by revenue, boasting a ninety year history in the construction business and "highly favorable" ratings from industry analysts. *See* C.G. Schmidt, Our History, http://www.cgschmidt.com/about/History.aspx (last visited Oct. 21, 2009). While industry experts may rave about CGS's work, Frederick Jackson has had less pleasant things to say about the company, prompting the case at bar. Jackson, an African American male, was hired to work for CGS in early August of 2006 as a journeyman carpenter. CGS immediately placed Jackson on a project at Columbia St. Mary's Hospital on Milwaukee's east side, a joint-venture that paired CGS with the Barton Malow Company. On August 17, 2006, while at work, Jackson and several of his co-

workers were reprimanded for their misuse of a ladder[1] by two supervisors, Ed Kopczenski, an employee of Barton Malow, and Dave Scritsmier, a manager for CGS. Jackson responded to the reprimand by saying he was "mortified" to learn that he was using the ladder incorrectly.  Another worker, who was white,  jokingly asked the supervisors whether the workers could substitute a five  gallon bucket for their ladder.  The CGS supervisor, apparently not finding either comment funny or helpful, further scolded the workers.  Shortly after, Mark Schmidt ("Schmidt"), who was at the time CGS's Field Personnel Coordinator in charge of hiring and coordinating employees for each of CGS's construction projects, was informed of the ladder incident by Kopczenski and Scritsmier.  Schmidt investigated what occurred and was told by CGS supervisors that Jackson had an attitude problem, but that his work was "average."  Nonetheless, Schmidt removed Jackson from the Columbia St. Mary's same work site.[2]  Schmidt did not remove Jackson's white co-worker from the project.  When Jackson protested to Schmidt about his demotion in light of his disparate treatment relative to his white co-worker, the CGS supervisor warned the carpenter to temper his complaints, ominously proclaiming to Jackson that "I could

---

[1]For simplicity, the events described occurring on August 17, 2006, will be referred to in this order as the "ladder incident."

[2]Much of the briefings to the court were devoted to why Schmidt removed Jackson from the Columbia St. Mary's project.  Schmidt did so, he contends, at the behest of Kopczenski who perceived Jackson's comment about being "mortified" regarding his misuse of a ladder as being a sarcastic remark, indicating his insubordination.  Jackson insists that he was not being "flippant" with his comment that he was mortified, but instead was being "penitent."  Moreover, Jackson contends that Kopczenski never made the request to remove Jackson.  The sincerity of Jackson's remark and the veracity over what prompted Schmidt to remove Jackson from the Columbia St. Mary's job site, both of which this court voices no opinion on, is immaterial to the issue at hand: whether CGS retaliated against Jackson for his filing of a complaint with the EEOC.

be your best friend or your worst enemy." (Jackson Dep at 144-46). Jackson was subsequently placed on three different CGS projects during the fall of 2006.

Four days after the ladder incident, on August 21, 2006, Jackson filed a charge with the EEOC alleging that CGS, by transferring Jackson from the Columbia St. Mary's project to another job site without taking similar action against his fellow white co-worker, discriminated against Jackson based on his race. Specifically, Jackson alleged, and continues to assert, that Scritsmier, the CGS superintendent, was the driving force behind his removal from the work site because of his hostility toward African American workers and that Schmidt docilely facilitated Scritsmier's wishes.[3]

In September of 2006, while Jackson was working at another CGS work site, Steve Kessel ("Kessel"), then CGS's Director of Human Resources, informed Schmidt about Jackson's discrimination charge, and, as a result, Schmidt prepared an explanation of what occurred at the Columbia St. Mary's job site for the EEOC's investigation. The only CGS officials that were definitely aware of Jackson's September 2006 charge before Jackson's termination occurred were Steve Chamberlin, the president of the company at the time, Richard Schmidt, Sr., the chairman of the company, Richard "Rick" Schmidt, Jr., the chief executive officer of

---

[3] While irrelevant to the question before the court, ultimately, the government found that no violation occurred and rejected Jackson's first complaint.

CGS, Tim Just, the Vice President of CGS's field operations, Steve Kessel, Shelley Anderson, the company's human resources coordinator, and Mark Schmidt.[4]

On October 6, 2006, Mark Schmidt received a promotion and was named CGS's General Supervisor in charge of Quality Control and Production. Instead of coordinating personnel to ensure that each of CGS's projects were properly manned, Schmidt's new job duties required him to monitor CGS's various projects to ensure that they complied with scheduling and production requirements, overseeing the foremen and sub-foremen in charge of each construction site. Assuming the position of Field Personnel Coordinator was Brent Johnson ("Johnson"), replacing Schmidt in the role of hiring and maintaining the necessary front-line workers for each work site. There was a short period of time, perhaps lasting as long as three months, in which Johnson "learned the ropes" of his new position from Schmidt, and Schmidt shared some of his old job responsibilities with Johnson. Johnson admits asking for advice and guidance from Schmidt in the early stages of the new position, as Schmidt works immediately next to Johnson in the CGS headquarters. Schmidt acknowledges that it was not uncommon for front-line workers to call him even after his promotion. Moreover, employees of CGS have conceded that Schmidt retains some authority to hire and fire front-line workers.

---

[4]The EEOC asserts that Tom Eplett, CGS's Vice President of Operations, Mike Borchardt, a construction superintendent, and Dave Scritsmier "may" have known of the complaint, but there is nothing in the evidence presented to the court that would indicate that a reasonable juror would find those claims credible. "Bare allegations not supported by specific facts are not sufficient in opposing a motion for summary judgment." *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (quoting *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir. 2003)).

-5-

On Friday, October 13, 2006, a week into Johnson's term as Field Personnel Coordinator, Jackson, now working on CGS's GE Tower Project on Milwaukee's north side, placed a two minute phone call to CGS's main office at 6:19 a.m. to state that he was going to be absent at work that day because of a medical appointment. Jackson did not call the foreman or the sub-foreman at the GE Tower work site or Brent Johnson. No message, if one was provided by Jackson to a person at CGS's main office, was relayed to Johnson. Jackson's phone records indicate that he received a five minute phone call from an employee at CGS on the afternoon of October 13, 2006, to ask him how his appointment went.[5]

The following week, Jackson had two more issues related to his attendance. Jackson's pay records contain a note scribbled in after the fact that the carpenter was late for work on Tuesday, October 17, 2006, by five minutes,[6] although his pay stub did not reflect any reduction for being late as was customary at CGS. Jackson denies that he was late on October 17, 2006. On Thursday of that week, Jackson called Mark Schmidt's direct line at 6:35 a.m. reporting that he would not be at work

---

[5]Johnson, on the other hand, claims he called Jackson to reprimand him for his absenteeism on that day. However, the court, on a summary judgment motion, must give full weight to Jackson's testimony about the material facts of the case. *See Payne v. Pauley,* 337 F.3d 767, 772 (7th Cir. 2003) ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied.")

[6]The EEOC attempts to argue that CGS's accusation that Jackson was late for work on October 17, 2006, is fallacious because the note scribbled on Jackson's pay stub states "Late Tues. Morning by 5 mins" and "October 17, 2006 was a Wednesday, not a Tuesday." (Pl's Proposed Finding of Fact 13 n. 1). The EEOC seems to be nitpicking in creating contested facts. This court can state with confidence that October 17, 2006, was, in fact, a Tuesday. *See* Calendar for year 2006 (United States), http://www.timeanddate.com/calendar/?year=2006&country=1, (last visited October 21, 2009).

Case 2:08-cv-00173-JPS   Filed 11/05/09   Page 6 of 24   Document 40

that day because of a knee injury.[7]  Jackson did not call CGS's supervisors stationed

at the GE Tower project or Johnson to report his absence.  While Johnson denies

receiving notice of Jackson's absence from Schmidt or any other person at CGS,

Jackson has submitted evidence that he did indeed receive medical attention for his

knee trouble on October 19, 2006.   Five days later, on October 24, 2006, Johnson

"laid off"[8] Jackson, informing the employee that his services were no longer needed

because of a "lack of work" for the defendant, in spite of the myriad of projects CGS

had around the city.[9]  Jackson did not work for CGS again.

On January 18, 2007, Jackson filed a second charge with the EEOC against

CGS, alleging that the company fired Jackson for filing his first complaint.  The

Commission, in investigating the retaliation claim, requested that CGS respond to

the charge in the form of a letter called a "position statement."  CGS ultimately

submitted four position statements to the EEOC.  On February 7, 2007, Steve

Kessel submitted a short letter on behalf of CGS that stated that Jackson was laid

off by CGS because of "a lack of work."  The February statement also indicated that

the President of CGS and the company's Vice President of Field Operations were

---

[7]The phone call lasted two minutes.  Schmidt does not recall taking the phone call, and Jackson does not assert whether he actually spoke to Schmidt or whether he left a message via voice mail or some other equivalent medium.

[8]CGS uses the term "laid off" to describe the end of Jackson's relationship with the firm.  Typically, according to CGS, "laid off" workers (as opposed to those who were terminated by CGS) would be restationed on other CGS projects, as needed.   Here, Jackson was never restationed on another project, nor was he placed on the list of "laid off" workers who were called when CGS needed personnel for a project.  As such, the court will refer to Jackson being "laid off" interchangeably with Jackson being "terminated" or "fired."

[9]Johnson claims that after he laid off Jackson, he told Mark Schmidt about what occurred, noting that while Jackson was an "average worker," his absences required his termination.

Case 2:08-cv-00173-JPS   Filed 11/05/09   Page 7 of 24   Document 40

aware of Jackson's September 2006 charge, but neglected to mention that any other employees of CGS, such as Mark Schmidt, were cognizant of Jackson's first complaint.

On March 15, 2007, Shelley Anderson, CGS's Benefits and Staffing Coordinator, substituting for Kessel who had just left the company, wrote a more detailed letter to the EEOC regarding Jackson's retaliation complaint. In the March letter, Anderson asserted for the first time that Jackson was laid off because he was not a "dependable worker," citing to his absences during October of 2006. The March statement opted to add Mark Schmidt and Steve Kessel to the list of CGS employees who knew of Jackson's first complaint.

Stefanie Meyers, who succeeded Steve Kessel as CGS's Director of Human Resources, sent another position statement to the EEOC on May 17, 2007, for the self-declared purpose of "clarifying the March 15, 2007 response provided by Shelley Anderson." In the May statement, Meyers wrote that the "parties involved in the decision to lay off Jackson were" Brent Johnson and Mark Schmidt, and detailed Johnson's role in making the decision to lay off Jackson. Meyers also disclosed to the EEOC CGS's attendance policy, stating that employees who "fail to report to work are given a verbal warning after the first occurrence" and that "repeat offenders are laid off."[10]

---

[10]Discovery in the case has revealed that while some sort of attendance policy exists at CGS, employees at CGS have had difficulties describing the contours of the company's attendance policy and the company's adherence to their policy's strictures has been less than consistent.

Case 2:08-cv-00173-JPS   Filed 11/05/09   Page 8 of 24   Document 40

Nearly a month later, on June 5, 2007, Meyers sent another statement to the EEOC, further detailing the facts surrounding Jackson's employment with CGS. Meyers reiterated in the June letter that CGS's "consistent practice" is to avoid terminating employees, instead opting to "lay off" employees who "no shows/no calls" more than one time. The June statement reiterated that both Johnson and Schmidt were "involved" in the decision to lay off Jackson.

An EEOC investigator performed on-site interviews at CGS's corporate offices regarding Jackson's retaliation claim on August 14, 2007. During the interviews, the investigator was told by Johnson that he was the one who made the ultimate decision to lay off Jackson, only informing Mark Schmidt afterwards about his decision. Johnson also opted to disclose in his EEOC interview for the first time that Jackson had, in addition to his attendance problems, work performance issues that contributed to his being let go by the company. Stefanie Meyers revealed during her interview that her statements to the EEOC that both Johnson and Schmidt were "involved" in the decision to terminate Jackson were based on discussions she had with the two CGS supervisors.[11] Following their investigation, on September 13, 2007, the EEOC issued a determination that there was reasonable cause to believe that CGS illegally retaliated against Jackson for filing his first charge against CGS, prompting the present litigation.

---

[11]Meyers has since changed her tone: in a deposition taken in February of 2009, Meyers testified that only Johnson made the decision to lay off Jackson and that Schmidt was informed of the decision after the fact.

## ANALYSIS

On March 30, 2009, CGS made a motion to the court for summary judgment pursuant to Fed. R. Civ. P. 56. A grant of summary judgment is appropriate where the evidence "shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 936 (7th Cir. 2007). A genuine issue of material fact exists when a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Jackson claims that he was a victim of unlawful retaliation, claiming that he suffered an adverse employment action as a result of filing his discrimination complaint with the EEOC. Title VII prohibits an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Title VII's anti-retaliation provision's goal is to prevent "employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (internal quotations omitted). The law is well-established that a plaintiff may proffer a prima facie case of retaliation in one of two ways: the "direct method" or the "indirect method." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). If the plaintiff's evidence can show

-10-

retaliation under one of the two methods, the case must proceed to trial, unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the defendant anyway, "in which event the defendant's retaliatory motive, even if unchallenged was not a but-for cause of the plaintiff's harm." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 643 (7th Cir. 2002); *see also Argyropoulos v. City of Alton*, 539 F.3d 724, 736 n.6 (7th Cir. 2008).

## A.     Direct Method

Under the direct method, the EEOC must demonstrate that: (1) Jackson engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection existed between the first and second prongs. *Id.* Here, the defendant concedes that the EEOC can prove the first two elements of a retaliation claim. The only issue the court must decide under the direct method is whether the EEOC has provided enough evidence to demonstrate a causal link between the protected activity and CGS's actions.

To establish a "causal link," either direct evidence or circumstantial evidence of retaliation may be proffered by the plaintiff.[12] *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). Direct evidence of retaliation requires an "actor's admission of discriminatory animus." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106,

---

[12] A common misconception hinted at in both briefs is that only "direct evidence" can suffice to prove retaliation under the direct method. However, circumstantial evidence is sufficient to create the causal link under the direct method. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 n.3 (7th Cir. 2005) ("Such confusion is understandable; 'there are several cases that arguably conflate the direct method with direct evidence' . . . [n]onetheless, 'we reemphasize here that use of direct evidence is merely one of two means (the other being the use of circumstantial evidence) of proceeding under the direct method.'") (internal citations omitted).

-11-

1114 (7th Cir. 2009). Such evidence is "rare," *Argyropoulos*, 539 F.3d at 733, and the EEOC does not submit such evidence to craft a causal link.[13] However, a plaintiff may also prevail "by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779-80 (7th Cir. 2006) (internal citations omitted); *see also Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) ("A case of discrimination can likewise be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction"). Suspicious timing, ambiguous statements made by the employer, words and actions toward employees in the protected group, and other "bits and pieces" from which an inference of discriminatory intent might be drawn are among the types of circumstantial evidence that may illustrate an inference of retaliation on the part of the decisionmaker. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). However, inferences that are supported by mere "speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). Here, the EEOC provides three central arguments for why the plaintiff can credibly infer that Jackson's filing of a

---

[13]The closest the EEOC has to direct evidence of discrimination is the "worst enemy" quote by Schmidt, which still requires several inferences to conclude that retaliation occurred. The quote will be discussed accordingly.

discrimination charge caused him to be fired, warranting denial of the defendant's motion under the direct method.

### 1. Temporal Proximity

First, the EEOC points to the temporal proximity between Jackson's protected activity and the adverse action that was taken against him, in that two months passed between the carpenter filing a racial discrimination complaint and him being laid off, as evidence of retaliation. However, standing on its own, a time period of a few months separating the protected activity and the adverse action is insufficient to establish a causal link for a claim of retaliation. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) ("Although there may be an exception to this general rule, when the adverse action occurs 'on the heels of protected activity,' . . . such a circumstance would be limited to matters occurring within days, or at most, weeks of each other.") (internal citations omitted). Here, nothing in the record regarding the timing of CGS's decision to layoff Jackson, in and of itself, would allow a reasonable juror to infer that CGS's action was linked to Jackson's earlier complaint. This is not to say, however, that the relatively short period of time between the complaint and the adverse employment action cannot, coupled with other evidence, help provide a reasonable inference that retaliation occurred.

### 2. CGS's Inconsistent Statements

Next, the EEOC argues that CGS's "shifting positions" and "dishonesties" allow the inference that retaliation occurred. The Commission points to several discrepancies in the information provided by CGS throughout the EEOC's

Case 2:08-cv-00173-JPS   Filed 11/05/09   Page 13 of 24   Document 40

investigation regarding various subjects. Of course, not all contradictions made by an employer are circumstantial evidence of retaliation. *See, e.g., Hall v. Forest River, Inc.,* 536 F.3d 615, 623 (7th Cir. 2008) (rejecting as circumstantial evidence of retaliation discrepancies by the employer regarding the date of an employee's promotion). However, when an employer offers differing explanations regarding an adverse employment action, and when evidence has been presented that allows a reasonable trier of fact to disbelieve each explanation, a jury may reasonably infer that the employer is "hiding something that– that is, that the true explanation is unlawful discrimination." *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1024 (8th Cir. 1998); *see also*; *Simple v. Walgreen Co.,* 511 F.3d 668, 671 (7th Cir. 2007) ("The inconsistency is suggestive of pretext and thus is evidence of discrimination."); *Schuster v. Lucent Technologies, Inc.,* 327 F.3d 569, 579 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext"); *Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir. 1995) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment.")

The EEOC first takes issue with CGS's nomenclature for Jackson's termination, noting that CGS continues to refer to Jackson's termination as a "lay off" when in reality it was a "firing." The court fails to see how CGS's supposed mendacity on this subject is anything more than a difference in semantics, particularly when CGS concedes that the "lay off" was an adverse employment

-14-

action. CGS calling Jackson's termination a "lay off" does not warrant concluding that retaliation occurred.

The Commission next asserts that CGS has not been honest about Jackson's absenteeism or competence at his job. Specifically, the EEOC notes that CGS's original complaints that Jackson never called to report his absences have been countered by Jackson's phone records that provide proof that he called the company on the morning of his absences. Moreover, the plaintiff cites to several comments made by CGS supervisors during and in the immediate aftermath of Jackson's employment referring to Jackson as an "average" worker to show inconsistencies with the company's current evaluation of Jackson's job performance. While perhaps some of CGS's actions and comments can be explained away as being consistent, the job of evaluating such an explanation falls on the shoulders of the jury and not this court. Judging the evidence in a light most favorable to the non-moving party, the court finds that a reasonable juror could conclude that CGS's inconsistencies regarding Jackson's employment record provides some evidence to allow an inference that retaliation occurred.

More significant, however, is the EEOC's argument that CGS has made shifting statements regarding: (1) whose decision it was to terminate Jackson's employment; and (2) the rationale for that decision. Not one, but two position statements by CGS indicated that the "parties involved" in the decision to terminate Jackson were *both* Brent Johnson and Mark Schmidt. In August, in an interview with the EEOC investigator, Johnson said that he was the only person responsible for

-15-

terminating Jackson's employment. The EEOC logically contends that CGS shifted

their explanation because conceding the involvement of Schmidt, Jackson's former

supervisor and the person who had to respond to the carpenter's racial

discrimination complaint, in Jackson's firing would be suspicious and help provide

an inference that retaliation was the true reason behind the firing. CGS responds

by claiming that no contradiction has occurred, and that Meyers, who was new to her

job, misstated who was involved in the Jackson firing decision. However, CGS

ignores that Meyers has testified that she did not base her statements in the letters

to the EEOC on her own whim, but rather was propelled from her conversations with

both Johnson and Schmidt to write that both supervisors were "involved" in the

decision to fire Jackson.[14] To the extent that the word "involved" is ambiguous,[15] the

jury, rather than this court, is the appropriate body to resolve why Meyers chose to

use that word in two separate letters. Perhaps CGS's shift in their explanation is not

nefarious, but is rather the product of clumsy wording, but to decide that question

would force this court to weigh the credibility of the EEOC's assertions, an improper

role to cast this court in at the summary judgment stage. *Paz v. Wauconda*

---

[14]CGS also argues, citing to *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995), that Meyers merely clarified her ambiguous statement to the EEOC in her deposition, and that deposition testimony should be favored over a written statement. (Def's Reply Br. 12). The defendant misreads *Russell*. *Russell* merely stands for the proposition that where a deposition statement is corrected by an affidavit carefully crafted by a party's attorney, the deposition statement trumps. Here, the conflicting statement was made by Meyers in two separate letters before she attempted to "clarify" her position in her deposition. Nothing in *Russell* states that the court can disregard for purposes of resolving a summary judgment motion contradictory statements made by the defendant's agents.

[15]While CGS asserts that "involved" merely meant that Johnson informed Schmidt of the firing after the fact, the court concludes that a reasonable juror could find that the word "involved" connotes a much more active role performed by Schmidt in the firing.

Case 2:08-cv-00173-JPS   Filed 11/05/09   Page 16 of 24   Document 40

*Healthcare & Rehab. Ctr., LLC,* 464 F.3d 659, 664 ("At summary judgment, 'a court may not make credibility determinations...[this is a] job for a factfinder.'") (internal citations omitted).  CGS has shifted their story on who was involved in the decision to lay off Jackson, providing some evidence, albeit not very strong evidence on its own, that retaliation occurred.

Perhaps if the EEOC could only point to CGS's inconsistent statements regarding Jackson's employment record and who made the decision to fire Jackson, the court would be reluctant to deny CGS's motion.  However, the EEOC also directs the court's attention to CGS's ever-changing rationales for why it laid off Jackson.  Initially, in statements made to Jackson and then to the EEOC, CGS stated that Jackson was laid off because of a "lack of work."   Months later the company explained the "lack of work" comment really meant a "lack of work for Jackson," because of his absenteeism and tardiness.   Finally, in the midst of the EEOC interviews, CGS began suggesting that Jackson's work performance was sub-par and that was the reason for the firing.   The EEOC argues that CGS's shifting explanations for why Jackson was laid off is indicative of their failure to "get their story straight" and provides reason to infer that CGS retaliated against Jackson.  CGS replies that they have always maintained that when Johnson explained that there was a "lack of work," it meant a "lack of work" for someone like Jackson.  However, not withstanding CGS's creative explanation, at best the statements made

-17-

by Johnson are ambiguous and are best to be resolved by a jury.[16] Perhaps CGS's explanations for why it fired Jackson are consistent and perhaps CGS merely overdefended its decision, but, again, it is improper for this court to speculate and resolve on summary judgment questions related to CGS's motives and the company's credibility. *Paz,* 464 F.3d at 664.

### 3. Mark Schmidt's Role in Jackson's Termination

Lastly, the EEOC points to Mark Schmidt's role in Jackson'S termination as evidence that retaliation occurred. Specifically, the Commission argues that Schmidt's "worst enemy" comment, coupled with his influence over the decision to terminate Jackson, allow the reasonable inference that retaliation occurred. Causation may be proved through ambiguous statements from which an inference of discriminatory intent might be drawn. *Phelan*, 463 F.3d at 781 (7th Cir. 2006). However, by itself, "an isolated comment or 'stray remark' is typically insufficient to create an inference of discrimination, but it may suffice if it (1) was made by the decisionmaker, (2) around the time of the decision, and (3) referred to the challenged employment action." *Mach v. Will County Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009); see also *Volovsek v. Wis. Dep't of Agric., Trade, & Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1116 (7th

---

[16]CGS also argues that, even if it was incorrect about Jackson's absenteeism and tardiness, the company is afforded the protection of the "honest-belief rule." Under the honest-belief rule, "even if the business decision was ill considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason given for the action, pretext does not exist." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007 (7th Cir. 2004). While this argument is relevant when the court decides the pretext question, the rule is inapplicable in the context of the EEOC's argument about CGS's shifting explanations. Even if CGS acted on the honest, but perhaps flawed, belief that Jackson's termination was warranted by his absenteeism, that does not explain why CGS did not raise that as the reason for firing Jackson when Johnson laid off the carpenter or when CGS first responded to the EEOC via their position statements.

-18-

Cir. 1992) (holding that a comment will not allow for an inference of retaliation unless it was related to the alleged discriminatory employment decision and made by the "decisionmaker.") CGS makes two main arguments in response to the EEOC's contention.[17]

First, CGS states that Schmidt was not the "decisionmaker," so regardless of whether he made the "worst enemy" comment, the comment cannot be linked to Jackson's termination. In the context of an employment discrimination dispute, a decisionmaker is one "who is involved in the process of making the employment decision at issue." *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007); *see also Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) ("A decisionmaker is the person 'responsible for the contested decision.'") (internal citations omitted). Here, there is genuine issue of material fact as to whether Schmidt was "involved in the process of making" or "responsible for" the decision to terminate Jackson's employment.[18] Not only did CGS use, in two of their position statements to the EEOC, identical words to the Seventh Circuit's standard for what a "decision-maker" is to describe Schmidt's role in the firing of Jackson, but concessions by both Johnson and Schmidt, along with comments by other employees of CGS, indicate that Schmidt retained some level of authority for making the decision to fire a front-line employee in the weeks and months after his promotion. At the very least,

---

[17]CGS also disputes that the statement was made, but this is a factual question that is only appropriate for the jury to resolve.

[18]Because the court concludes that there is a triable issue as to whether Schmidt was involved in adverse employment action, CGS's repeated contention that Johnson was unaware of Jackson's first complaint is irrelevant.

Johnson's admissions that he consulted with Schmidt in the early stages of his job show that Schmidt may have been involved in the decision to fire Jackson. Moreover, one can reasonably infer, given Schmidt's prior position, his involvement in the decision to move Jackson from the Columbia St. Mary's job site, the short period of time between when Schmidt relinquished his former title and when Jackson was fired, and even the location of Schmidt and Johnson's offices, that Schmidt played an active role in the decision to end Jackson's employment with the company. In short, a reasonable juror can conclude that Schmidt was a decisionmaker.[19]

Second, CGS argues that even if Schmidt was a decisionmaker, Schmidt's comments were made far too long before CGS's layoff decision, such that the comment cannot be proof of retaliation. The court disagrees. Schmidt's comment about becoming Jackson's "worst enemy" was made in the context of Jackson pleading to stay on the Columbia St. Mary's job site, raising the inference that Schmidt was warning Jackson to not give him any trouble because of the demotion. A reasonable juror could conclude that Schmidt's comment, made merely two months before CGS opted to fire Jackson, are an indication of Schmidt's attitude

---

[19]While not fully raised by the parties, even if Schmidt was not a "decisionmaker," the EEOC also has provided enough evidence to proceed under the "cat's paw" theory. This circuit's courts have recognized that in some instances the "prejudices of a subordinate or coequal employee to the formal decision-maker" can be imputed. *Lust v. Sealy, Inc.*, 383 F.3d 580, 584-85 (7th Cir. 2004). This so called "cat's paw" theory is appropriate where the employee was "able to influence the decision," "tainted the decision maker's judgment," or "was able to manipulate the decisionmaking process." *Mach*, 580 F.3d at 499. Here, besides Schmidt's active role in helping Johnson with early decisions with his job as Field Personnel Coordinator, the Commission has presented evidence that Jackson called Schmidt's phone to tell him that he would not be at work and that Schmidt never told Johnson about the phone call, allowing the inference that Schmidt manipulated Johnson's decisionmaking process, causing Jackson's termination.

-20-

toward workers who caused the company trouble in the wake of a decision to pull a worker off a job site.

Viewing the evidence gathered by the EEOC as a whole, the court can conclude the Commission has provided enough evidence under the direct method to infer a causal link between Jackson's protected activity and the adverse employment action. While perhaps when viewed individually the evidence would not suffice to allow the EEOC to survive summary judgment, the timing of CGS's decision to lay off Jackson, the repeated inconsistent statements by CGS regarding Jackson's dismissal, and the comment made by Mark Schmidt after Jackson's removal from his first CGS job site provide enough "tiles" to create a mosaic displaying an image of intentional discrimination. *See Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009).

## B. Indirect Method

The second way a plaintiff can make out a case for illicit retaliation is the "indirect method" derived from the procedure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). The Supreme Court created the "indirect method" for Title VII discrimination claims because of the difficulty of directly proving discrimination, or, specifically in the retaliation context, of crafting a viable causal link between the protected activity and the adverse employment action. *Hildebrandt*, 347 F.3d at 1029. However, given the mosaic of direct evidence that the EEOC has presented, the court need not use the *McDonnell Douglas* burden shifting test. *See Paz,* 464 F.3d at 666 (holding that once a plaintiff

-21-

has satisfied the direct method of proving retaliation, there is no need to have a court evaluate the plaintiff's case under the indirect method); *see also Lang v. Illinois Dep't. of Children & Family Servs.*, 361 F.3d 416, 421 (7th Cir. 2004); *Sullins v. Ill. Dep't of Pub. Aid*, No. 04-3039, 2006 U.S. Dist. LEXIS 13453, at *49 (C.D. Ill. Mar. 10, 2006) ("However, because the Court has found that Sullins' evidence at least creates a genuine issue of fact under the direct method of proof, there is no need to analyze the facts under the indirect method."); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.'") As such, the court continues with the last step in its evaluation of whether the EEOC has survived summary judgment.

**C.    Was CGS's retaliatory motive a "but for" cause of the adverse employment action?**

       After both the direct and indirect methods are explored to see if the plaintiff can make out a prima facie case for retaliation,  the question that remains for the court "is whether the employer would have taken the same action had it not been for the protected characteristic of the employee."  *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169 (7th Cir. 1998).  Specifically, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action, *Stone,* 281 F.3d at 644, and, if the defendant satisfies its burden, the plaintiff must show that the

defendant's explanation was pretextual to survive summary judgment. *Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280 (7th Cir. 1985).

Here, CGS contends that Jackson's attendance and performance issues justified Jackson's termination regardless of their retaliatory motivation. However, as discussed earlier, the EEOC has presented enough evidence to doubt the veracity of CGS's claims. Beyond CGS's shifting statements, *see Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 851 (7th Cir. 2007) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext if the explanations are sufficiently shifting and inconsistent to permit an inference of mendacity") (internal citations omitted), the Commission, through phone records and the sworn testimony of CGS's employees, has raised legitimate questions as to whether Jackson truly failed to follow the company's policies regarding reporting a future absence. Moreover, the testimony of several of CGS's supervisors about Jackson's work performance provide doubt as to whether Jackson truly had any serious work performance problems. In short, the defendant has failed to "produce *uncontradicted evidence* that he would have fired" Jackson even if the carpenter had not filed his discrimination complaint. *Argyropoulos,* 539 F.3d at 736 (emphasis added).

Furthermore, relying on *Little v. Illinois Dept. Of Revenue*, CGS also argues that it was the company's honest belief that Jackson's attendance issues warranted his dismissal, and, even if CGS was incorrect about Jackson's employment issues, if the decisionmaker "honestly believed the nondiscriminatory reason he gave for the

-23-

action, pretext does not exist." *Little,* 369 F.3d at 1012. However, *Little* is inapplicable in this case, as the plaintiff has provided evidence, including the threat made by Schmidt and CGS's shifting explanations, that puts into doubt whether the adverse employment action was done out of a truly honest belief.

As such, the EEOC had met its burden by providing a prima facie case of retaliation from several sources of circumstantial evidence. CGS has failed to provide uncontradicted evidence that it would have fired Jackson had it not been for the carpenter's filing of a discrimination complaint. The court must conclude that this case warrants having a jury examine the evidence provided by the plaintiff and the defendant and, ultimately, make the proper determinations on the credibility of each side's story to bring this litigation to a conclusion.

Accordingly,

**IT IS ORDERED** that defendant's Motion for Summary Judgment (Docket #11) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 5th day of November, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-24-